Opinion delivered June 9, 1886.

[No. 5067.]

## JIM KERRIGAN *v.* THE STATE.

1. PRACTICE—STATEMENT OF FACTS.—That the statement of facts was approved and certified by the trial judge after the same was filed by the clerk, was a mere irregularity, and is not an objection to the instrument which will be considered on appeal.

2. SAME.—It is only required of the trial judge that he shall make out and sign a "correct statement of the facts proved on the trial." Neither the statute (Rev. Stat., Art. 1378,) nor the rule (Dist. Ct. Rule 116) requires that the certificate should state, in so many words, that the statement contains *all* the facts proved. Certificate that the statement of facts is a " correct statement of the facts proved " is sufficient to certify the statement of facts.

3. EVIDENCE—CHARGE OF THE COURT —In the absence of testimony tending to implicate witnesses for the State in the commission of the offense, the trial court did not err in omitting to charge the law applicable to accomplice testimony.

4. ASSAULT TO ROB—FACT CASE.—See the statement of the case for evidence *held* sufficient to support a conviction for assault with intent to rob.

APPEAL from the District Court of Tarrant. Tried below before the Hon. R. E. Beckham.

The conviction in this case was for an assault upon the person of M. B. Loyd, with intent to rob the said Loyd, in Tarrant county, Texas, on the sixth day of June, 1885. The penalty assessed by the jury was a term of eight years in the penitentiary.

M. B. Loyd was the first witness for the State. He testified that, on the night of June 6, 1885, he was assaulted near his house on Lamar street, in the city of Fort Worth, Tarrant county,

Texas. Witness and Mr. Goldberg started to their respective homes together. They stopped at Mrs. Jane Smith's corner, and had quite a long conversation, during the progress of which Judge Kellar, his wife and daughter passed. At the close of the conversation, Mr. Goldberg went west towards his home, and witness south towards his residence. Two men put in their appearance at a point between fifty and sixty yards distant from Mrs. Jane Smith's corner, where witness and Goldberg separated. One was a short, heavy set man, and the other a tall man. The short man had a black hat pulled down over his eyes, and his coat collar turned up and buttoned closely about his throat. The short man took a position immediately in front of the witness on the side walk, while the tall one stood a few feet to the side, the two men and the witness forming a triangle. The short man drew a revolver and ordered the witness to throw up his hands. Witness, thinking he had fallen into the hands of robbers, hallooed, and thrust his hand into his pocket and got out his watch, intending to throw it over into an adjoining yard. The short man ordered witness not to halloo, nor to make any other noise, and at the same time struck witness with his pistol, breaking witness's nose. At that time witness had his watch in his hand. The blow in the face dazed the witness, but he retained his consciousness sufficiently to know that he was subsequently struck several times over the head with a pistol. The men were then frightened off by the hallooing of William Milliner, Mrs. Jane Smith's colored servant, and, the witness thought, the approach of other parties. Witness was too nearly stunned to know exactly how long it was, after they assaulted him, when the men ran off. Witness had seen the defendant before this trial, and thought that in build and stature he very nearly coresponded with the short, heavy set man who assaulted him. The short man had his head bundled up in his coat and turned to one side when he ordered witness to throw up his hands. Witness saw the defendant first in San Antonio, in January, 1885, and could remember his features in a general way. The assault occurred between nine and ten o'clock at night, on witness's side walk, near his residence, in the city of Fort Worth, Tarrant county, Texas. Witness's place of business was at the bank. Witness did not usually carry money on his person, but had five and a half dollars in his pocket on that night. That money was not taken.

Cross-examined, the witness testified that he was unable to

identify the defendant as either of the men who assaulted him as described. They did not get the witness's watch, nor did the witness know that they tried to get it. The night was a moonless, though not a very dark one. The stars were shining.

William Milliner testified, for the State, that he was an employe on the place of Mrs. Jane Smith, immediately north of Mr. Loyd's place. On the night and at the time that Mr. Loyd was assaulted, witness was sitting on the well curb in Mrs. Smith's yard, smoking. He heard the first cry, but did not respond to it. He heard the second cry, and ran around the house to the front gate, and called to the two men, asking: "What are you doing there?" They fled across the street to a vacant lot, and thence recrossed the street at an angle, passing witness at a distance of sixteen or seventeen feet. Witness asked them: "Are you trying to rob that man?" The tall man replied: "Go to h—ll, d—n you!" Witness saw the two men plainly and knew that the defendant was the short man.

Cross-examined, the witness testified that he never saw the defendant before the night of the assault, to know him. Captain Loyd hallooed "murder!" Witness went to the right hand side of Mrs. Smith's gate, which was twenty or twenty-five steps from the north east corner of her lot, and about seventy-five feet from the point at which the assault was committed. Two blows on Loyd's head were struck after witness got his position at the gate. Loyd hallooed continuously. In their flight from the vacant lot, the men passed within seventeen feet of the witness, and he saw their faces plainly by the light of the street lamps. The defendant, and no other, was the short, heavy set man.

Thomas Montgomery testified, for the State, that he lived on the east side of Lamar street. Loyd lived on the west side of the said street, south of witness. Loyd's house was situated on the same block with and south of Mrs. Jane Smith's house, and opposite Mr. Bird's house. Loyd was assaulted between his and witness's houses, on the west side of the street, where the street was sixty or eighty feet wide. Witness heard the cries of distress and went to his front gallery, where he found a negro whom he told to go down the street and see what was the matter. The negro showing fear, the witness went, accompanied by the negro. When he first stepped out of his house witness heard William Milliner's voice, and saw two men in the street, about opposite Mrs. Smith's, going towards B. C. Evans's place from the vacant lot. They were then quartering across the street.

The gas lamps were then burning brightly, and gave enough light to enable a person to recognize another across the street, if in the circle of the light. The men had passed witness's house before witness saw them, and were then in the middle of the street. Witness did not recognize either of them.

Mrs. Sallie Martin testified, for the State, that in June, 1885, she lived at the Hotel French, at the corner of Fifteenth and Calhoun streets, in Fort Worth. Witness first saw defendant on the twenty-eighth day of April, 1885, when she married Dan Martin. On or about the last day of June, 1885, witness had a conversation with the defendant. Her husband got hurt in a fight June 27, 1885. The defendant, who was in some way connected with that fight, met witness near Galloway's saloon, about the last day of June, and asked her how her husband was. He then told witness what he did in the fight in which witness's husband got hurt. Witness told him that he had better take care; that the police were on the look out for the men who assaulted Captain Loyd. Defendant replied that he was not afraid; that the description given the police was not correct, and that the men who assaulted Loyd could not be identified. Witness replied that she knew them. Defendant asked: "How in the hell do you know any thing about it?" The witness replied: "You talk in your sleep." Defendant replied: "Well, you think too much of Dan to say any thing about it, and send him over the road. You can't send one without sending both." Nothing further was said during the conversation.

Some time in October, 1885, while the races at Paris were in progress, the witness had another conversation with defendant, who was then known as "Red." Witness's husband was then, and defendant had been, away from Fort Worth. Witness heard through a Mr. Golden that the defendant had returned to Fort Worth. She accordingly went to his room at Bradley's house to ask him about her husband. She found him asleep, and roused him up. She then asked him where her husband was. He said that he did not know. She then asked him if he thought her husband would ever come back to her, and again he replied that he did not know. Witness then remarked that she wished very much that he (her husband) would come back and go to house keeping. Defendant said, in reply, that Dan would come back to witness after the races, and added: "Martin and I would have been all right, and you would have been house keeping, if we had gotten the 'stuff' (meaning money) from Loyd." Wit-

ness asked him how it happened that they did not get it. Defendant replied: "That d—d nigger scared us away. I wish we had killed Loyd so that he could not identify us." He then said that he was going to leave town, and was not coming back.

On the Monday after Christmas, 1885, witness went to the city hall, and there she met the defendant, who asked her what she was doing there, and whether or not she was called as an identifying witness in any case. He then made an engagement to visit the witness that evening at two o'clock, at the house of Mrs. Conner, where witness was then staying. When he called that evening he talked to witness about his past life, and about her husband. He said that he did not think the witness's husband left because of the Loyd assault. He said that the police were hunting a long and a short man, and could not find the right parties that way, but would go to hell for a reward. Defendant told witness, in the conversation at Bradley's, that on the day of the attempted robbery, he and Dan heard that Loyd would have about six hundred dollars on his person that night. Defendant and witness's husband left Fort Worth together on the Sunday evening after the attempted robbery of Loyd, and remained away until June 26, 1885.

Cross-examined, witness stated that she had once before testified about the matter, substantially as she testified on this trial. She could not remember that she mentioned her husband in her testimony before the examining trial. She did not then care to mention her husband's name. She said nothing on that trial about meeting the defendant at his room at Bradley's house, because her husband did not want her to go to that house. When witness asked the defendant, in his room at Bradley's, where her husband was, he replied in words: "I don't know where in the h–ll he is. I left him at Gainesville. He is more stuck on you than he ever was. He is safe in any county, and can not be identified. He will stay away until he gets 'stuff' enough to go to house keeping. If we had got the 'stuff' from Loyd you could have gone to house keeping." "Mollie," Bradley's chambermaid, came into defendant's room while witness was there, and she, defendant and witness, took a drink of whisky, but no beer. Witness had then got through her talk with defendant about her husband, and was shaming him for maltreating the woman with whom he had been living. She told him that she had been talking with the woman. Defendant did not arrange to take the witness away from Fort Worth, nor did the witness tell Mollie Johnson

that she would "do defendant up" unless he took her away. Witness had never said that Golden let her in (at Bradley's) through the bed room door. Witness's next conversation with defendant was at Mrs. Conner's house, on the evening of the day on which she saw him at Bradley's. Defendant did not call at Mrs. Conner's again that night, though the witness had company that night until ten o'clock. Mrs. Conner was not in Fort Worth at that time. The company alluded to was deputy marshal Charley Scott, to whom the witness first mentioned the names of defendant and her husband as the assailants of Loyd. Mr. Kellar was the first man with whom the witness talked about exposing the perpetrators of the assault upon Loyd. Defendant, at the time of the assault, wore a soft black hat. Witness had no feeling of any kind towards defendant. She had some towards her husband.

Mrs. T. J. Johnson testified, for the State, that she lived on Lamar street when Captain Loyd was assaulted. Witness heard the hallooing about nine o'clock, and ran out to the fence and saw two men going towards Jarvis's place. Some stone was lying in front of the vacant lot on which Mr. Lake's house has since been built. The two men, one much taller than the other, were going north between the stone and the side walk. They had their heads turned sideways to witness. The lamp light was bright enough to have enabled witness to recognize an acquaintance across the street. Witness could not see the faces of the men well enough to be able to recognize them now. The State closed.

Mollie Johnson, the first witness for the defense, testified that she lived at Bradley's restaurant and saloon. She knew Sallie Martin, but had never seen her in the defendant's room in Bradley's house, and had never taken a drink of whisky with her in that room.

Billy Golden testified, for the defense, that he lived at Bradley's restaurant. He knew Sallie Martin, but he never, at any time, met her on the street and had a conversation with her about defendant. He may, at some time or other, have told her that defendant was in town, but he never met her on the street and told her that defendant was at a room in Bradley's house. Defense closed.

Mr. Garblop testified, for the State, that he read in the papers an account of the assault on Captain Loyd, on the morning after it occurred. Defendant and Dan Martin, who boarded to-

gether at the house next door to witness's store, appeared restless and uneasy on the day after the assault. The witness did not see either of them for several days after the day succeeding the assault on Loyd, but did not know whether cr not they left town.

The motion for new trial raised the question discussed in the opinion.

*B. G. Johnson* and *Bascomb & Essex*, for the appellant.

*J. H. Burts*, Assistant Attorney General for the State.

WILLSON, JUDGE.   That the statement of facts was approved and certified by the judge after it had been filed by the clerk, was a mere irregularity, which does not require this court to refuse to consider the paper as a legal statement of facts.

The objection made to the sufficiency of the certificate of the judge to the statement of facts is not a good one. The judge certifies that the statement is "a correct statement of the facts proven." This, in effect and substance, is equivalent to certifying that it was "a correct statement of *all* the facts proved." There is no statute or rule of court which requires that the certificate shall state in so many words that the statement contains *all* the facts proved. (Rev. Stat., Art. 1378; Rule 116, Dist. Ct.; 2 Texas Ct. App., 679.) It is only required that the judge shall make out and sign a *correct* statement of the facts proved on the trial, and the judge in this instance certifies that the statement is a correct statement of the facts proven. It could not be a *correct* statement without containing *all* the material facts proved. The certificate would have been more emphatic if it had used the word "all" before the word "facts," but its meaning and effect would have been the same.

In Darcy v. Turner, 46 Texas, 30, a certificate that the statement contained "all the evidence *material* in the case," was held to be in substantial compliance with the law. In Kelso v. Townsend, 13 Texas, 140, it was held that a certificate that the statement contained "all the material facts proved upon the trial," was sufficient. We have not been cited to any decision which holds that the certificate must, in so many words, state that the statement contains *all* the facts proved. A certificate, such as the one before us, is, to our minds, far less objectionable than those held sufficient in the two cases above cited. In those

cases the judges certify that the statements contain all the *material* facts, not all the facts proved. The judges were, therefore, permitted to pass upon the materiality of the facts proved in preparing the statements. In the case before us the certificate purports that the facts proved on the trial are contained in the statement, and the judge does not qualify his certificate by confining the facts to those which, in his judgment, are *material*.

In our judgment there is no error in the charge of the court, nor in the omission to charge the law with reference to accomplice testimony. There is not a particle of evidence in the record which, in our opinion, shows, or even tends to show, that the State witness Sallie Martin, or any other witness that testified on behalf of the State, was an accomplice in the crime committed by the defendant.

As to the sufficiency of the evidence to support the conviction there can be no doubt. We have found no error in the judgment and it is affirmed.

*Affirmed.*